IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

CRYSTAL WATSON                                                                          PLAINTIFF

v.                                    Case No. 3:18-cv-00141-LPR

CENTURY MANAGEMENT LLC,                                                     DEFENDANTS
CENTURY MANAGEMENT INC.
*Doing business as McDonald's*

## ORDER

    Plaintiff Crystal Watson is suing her former employers, Century Management LLC and Century Management Inc. (collectively "Century Management"). Century Management owned many McDonald's restaurants in Arkansas and other states.[1] Ms. Watson says that Century Management violated federal and state statutes prohibiting discrimination based on gender when it promoted a male colleague, Mr. Mike Duffle, to an Area Supervisor position instead of her.[2] Ms. Watson also says that Century Management subjected her to a hostile work environment and retaliated against her by way of a constructive discharge.[3] Pending before the Court is Century Management's Motion for Summary Judgment.[4] Century Management believes it is entitled to summary judgment on all claims.

---

[1]    Ex. 1 to Defs.' Notice of Filing Suppl. Exs. (Doc. 36-1) ¶ 2; Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 34) at 2.

[2]    There are some stray references in various filings regarding other promotions. However, with respect to the failure to promote claims, the Amended Complaint is exclusively focused on Mr. Duffle's promotion to Area Supervisor. Pl.'s Am. Compl. (Doc. 5) ¶¶ 5, 43-49. So is the underlying EEOC complaint. Ex. 2 to Defs.' Notice of Filing Suppl. Exs. (Doc. 36-2) at 1.

[3]    Pl.'s Am. Compl. (Doc. 5). The Amended Complaint does not make a free-standing discrimination claim based on the September 2017 demotion. The September 2017 demotion is only used in a supporting role as part of the hostile work environment and retaliation by constructive discharge claims.

[4]    Defs.' Mot. for Summ. J. (Doc. 33).

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[5]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[6]  It is important to understand that "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[7]  To prevent summary judgment, the dispute of fact must be both genuine and material.[8]  A genuine dispute of fact exists where a rational jury could decide the particular question of fact for either party.[9]  A material dispute of fact exists where the jury's decision on the particular question of fact determines the outcome of a potentially dispositive issue under the substantive law.[10]

The moving party has the burden of showing that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[11]  If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[12]  The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine

---

[5]   *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing FED. R. CIV. P. 56).

[6]   *Grey v. City of Oak Grove, Mo*., 396 F.3d 1031, 1034 (8th Cir. 2005).

[7]   *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

[8]   *Id.*

[9]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10]   *Id.*

[11]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[12]   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-87 (1986); *Torgerson*, 643 F.3d at 1042.

issue for trial."[13]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[14]  Accordingly, for purposes of the Motion here, the Court considers the most pro-plaintiff version of the record that a reasonable jury could rationally conclude occurred.

For the reasons discussed below, Century Management is entitled to summary judgment on all claims in this case.

1.   *Failure to Promote Claims*

Ms. Watson's federal and state failure to promote claims cannot survive.  They are time-barred.  Pursuant to Title VII, a discrimination charge shall be filed with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred."[15]  Ms. Watson filed her EEOC complaint on November 27, 2017.[16]  One hundred and eighty (180) days prior to November 27, 2017 is May 31, 2017.  It is clear that Mr. Duffle's promotion occurred prior to May 31, 2017.

- *First*, Ms. Watson wrote in her EEOC claim,"[i]n December 2014, I suffered sex discrimination when a less qualified male than I was promoted to area supervisor and I had to fill his vacant position as general manager."[17]

- *Second*, in the Amended Complaint, Ms. Watson repeats this assertion, identifying in at least two separate places the same December 2014 date.[18]

- *Third*, in the Statement of Material Facts, Defendants stated that Mr. Duffle was selected for the promotion to Area Supervisor "in or after late 2015."[19]  Ms. Watson agreed.[20]  Also

---

[13]   *Celotex Corp.*, 477 U.S. at 322-24.

[14]   *Pedersen v. Bio-Med. Applications of Minn*., 775 F.3d 1049, 1053 (8th Cir. 2015).

[15]   42 U.S.C. § 2000e-5(e)(1).

[16]   Ex. 2 to Defs.' Notice of Filing Suppl. Exs. (Doc. 36-2) at 1.

[17]   *Id.*

[18]   Pl.'s Am. Compl. (Doc. 5) ¶¶ 5, 43-49.

[19]   Defs.' Statement of Facts (Doc. 35) ¶ 27.

[20]   Pl.'s Statement of Facts (Doc. 43) ¶ 27.

in their Statement of Materials Facts, Defendants stated that Mr. Duffle's promotion created a General Manager ("GM") opening in the Newport store, that the GM position in the Newport store was then offered to Ms. Watson, and that "[she] accepted the offer and went back to the Newport Store in or around late 2015."[21]  Ms. Watson agreed.[22]  Based on these two undisputed facts, the promotion of Mr. Duffle occurred by the end of 2015.

- *Fourth*, the latest date Ms. Watson ever suggested the promotion occurred in her somewhat confusing deposition was January of 2017.[23]

Because Ms. Watson's EEOC complaint was untimely, Century Management is entitled to summary judgment on the Title VII failure to promote claim.[24]

With respect to the state law failure to promote claim, Arkansas Code Section 16-123-107 provides that an action based on employment discrimination can only be brought within one year of when the alleged discrimination occurred or within ninety (90) days of receiving a "Right to Sue" letter from the EEOC, whichever is later.[25]  Looking at the first possibility under the statute, Ms. Watson filed her case on August 1, 2018.  One year before that is August 1, 2017.  And we have already established above that Mr. Duffle was promoted prior to August 1, 2017.  That option does not work.  But what about proceeding under the other prong of the statute?  Ms. Watson received her "Right to Sue" letter on July 30, 2018, just two days before she filed the lawsuit.[26]  That's within ninety (90) days.  But there's a problem for Ms. Watson.  Proceeding under this prong of the statute is not viable for her either.  Eighth Circuit precedent has made clear that this

---

[21]   Defs.' Statement of Facts (Doc. 35) ¶ 34.

[22]   Pl.'s Statement of Facts (Doc. 43) ¶ 34.

[23]   Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 69:11-70:17.

[24]   *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Kirklin v. Joshen Paper & Packaging of Ark. Co*., 911 F.3d 530, 534-35 (8th Cir. 2018); *Jones v. City of St. Louis, Mo.*, 825 F.3d 476, 482 (8th Cir. 2016); *Burkhart v. Am. Railcar Indus., Inc*., 603 F.3d 472, 476 (8th Cir. 2010); *Diaz v. Swift-Eckrich, Inc*., 318 F.3d 796, 798 (8th Cir. 2003); *Sowell v. Alumina Ceramics, Inc*., 251 F.3d 678, 682-83 (8th Cir. 2001); *Bledsoe v. Nucor-Yamato Steel Co*., 18 F. App'x 433, 435 (8th Cir. 2001) (unpublished opinion).

[25]   ARK. CODE ANN. § 16-123-107(c)(4).

[26]   Ex. 1 to Pl.'s Compl. (Doc. 1).

4

prong of the statute is only available if the underlying EEOC complaint had been filed in a timely manner—that is, within one hundred and eighty (180) days of the discriminatory act.[27]   As established, that did not occur here.  Ms. Watson's state law failure to promote claim is untimely and Century Management is entitled to summary judgment on this claim.

One final point is worth mentioning.  In their Summary Judgment Motion, Defendants raise and extensively brief the time-bar issues discussed above.  In her Response, Ms. Watson does not respond to the time-bar issues at all.  She does not say that her EEOC complaint was timely filed with respect to the failure to promote claims.  She does not say that, despite the untimeliness of her EEOC claim, there is some reason to conclude that her lawsuit was timely filed with respect to either the federal failure to promote claim or the state failure to promote claim.  She does not argue that some other doctrine (tolling, equitable estoppel, etc.) allows her to proceed on one or both claims despite their untimeliness.   She is completely silent on the time-bar issues. Accordingly, Ms. Watson has forfeited or waived any opposition to summary judgment on this ground.[28]

---

[27]   *See Burkhart*, 603 F.3d at 476; *Duty v. Norton–Alcoa Proppants,* 293 F.3d 481, 489-90 (8th Cir. 2002); *see also Holt v. Deer-Mt. St. Judea School District*, 135 F. Supp 3d. 898, 904 (W.D. Ark 2015).

[28]   *See Anderson*, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials . . . but must set forth specific facts showing that there is a genuine issue for trial."); *Satcher v. Univ. of Ark. at Pine Bluff Board of Trustees*, 558 F.3d 731, 734-35 (8th Cir. 2009) ("Contrary to Satcher's argument, failure to oppose a basis for summary judgment constitutes waiver of that argument."); *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."); *Green v. Byrd*, 358 F. Supp. 3d 782, 786 (E.D. Ark. 2018).  Ms. Watson's entire Response was—to be frank but diplomatic— outside the norm for a case litigated by counsel.  Ms. Watson didn't really directly respond to or address any of the arguments raised by Century Management.  Instead, Ms. Watson provided a list of statements from the depositions of Ms. Snow and Ms. Watson with page citations, some law on summary judgment and discrimination, and a bullet point-type list of Arkansas state law cases about the tort of outrage.  Leaving the Court to try and connect the often random, disjointed, and very distant dots is neither particularly effective nor particularly wise.  Indeed, in this instance, it comes fairly close to waiving all opposition to summary judgment.  Nonetheless, the Court has attempted to deduce the various arguments against summary judgment that Ms. Watson is trying to put forward.

At oral argument, Ms. Watson argued that the Duffle promotion claim should be considered timely because it was part of a continuous stretch of discriminatory acts, the last of which was less than one hundred and eighty (180) days before the EEOC complaint was filed.  This argument was not in Ms. Watson's brief, and is thus waived.

2.    *Hostile Work Environment Claims*

Mr. Duffle's promotion to Area Supervisor created a vacancy for a GM at the Newport location.[29]  Century Management offered this position to Ms. Watson, who at that point was the GM at a different location.[30]  She accepted it.[31]  At this Newport location, Mr. Jamie Davis was working as a Department Manager.[32]  Mr. Davis is an African American man.[33]  Ms. Watson knew Mr. Davis from the last time she had worked at the Newport store.[34]  This time around, Century Management tasked Ms. Watson with training Mr. Davis to be a GM in order to prepare him to eventually manage the Newport location.[35]  The idea was that Ms. Watson would become an Area Supervisor when one of those positions opened up, and Mr. Davis would move into the GM role in the Newport location.[36]

While Ms. Watson was GM of the Newport location, Mr. Davis was her direct subordinate.[37]  Ms. Watson alleges that she "suffered a hostile work environment from Jamie

---

Even if it wasn't waived, it is incorrect.  A failure to promote claim is a discrete discriminatory act that starts the one hundred and eighty (180) day clock when the promotion occurs.  *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114 ("Discrete acts such as termination, *failure to promote*, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'") (emphasis added); *High v. Univ. of Minn.*, 236 F.3d 909, 909 (8th Cir. 2000) (per curiam) ("This court has never applied the continuing violations doctrine to a discrete act, such as failure to promote, and we decline to do so now.").  This is true in theory.  It is also true in fact in this case.  Mr. Duffle's promotion had absolutely nothing to do with any of the other alleged acts of discrimination and retaliation in this case.

[29]    Pl.'s Statement of Facts (Doc. 43) ¶ 34.

[30]    *Id.* ¶ 34.

[31]    *Id.*

[32]    *Id.*  ¶ 36.

[33]    *Id.*

[34]    Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 113:23-114:8.

[35]    Pl.'s Statement of Facts (Doc. 43) ¶ 36.

[36]    Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 123:5-23.

[37]    *Id.* at 117:2-11; Pl.'s Statement of Facts (Doc. 43) ¶ 36.

Davis, a black male department manager she was required to train."[38]  She also alleges that Century Management through its "employees and management personnel" created a "hostile environment, racial in nature."[39]  According to Ms. Watson, the work environment unreasonably interfered with Ms. Watson's work performance and it was "intimidating, hostile, and offensive."[40]

Title VII and its state law analog prohibit employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."[41]  Under both federal and state law, to establish a claim for hostile work environment based on race or gender a plaintiff must show that: (1) he or she is a member of a protected group; (2) he or she was subjected to unwelcome race-based or gender-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment.[42]  The workplace environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[43]  It "must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed by [the plaintiff]."[44]

---

[38]  Pl.'s Am. Compl. (Doc. 5) ¶ 12.

[39]  *Id.* ¶ 14.

[40]  *Id.* ¶ 15.

[41]  42 U.S.C. § 2000e-2(a)(1).

[42]  *See Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005); *Dattoli v. Principi*, 332 F.3d 505, 506 (8th Cir. 2003); *Nicols v. Tri-State Logistics, Inc.*, 809 F.3d 981, 985 (8th Cir. 2016) (analyzing ACRA claims for hostile work environment using the same framework as Title VII).

[43]  *Singletary*, 423 F.3d at 892 (quoting *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003)).

[44]  *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010).

When considering the objective component, courts must examine the totality of the circumstances, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interfered with the employee's work performance."[45]  Courts must also consider the "physical proximity to the harasser, and the presence or absence of other people" in the totality of the circumstances.[46]  Claims of hostile work environment must meet a demanding standard and courts are tasked with "filter[ing] out" complaints that only raise "ordinary tribulations of the workplace."[47]  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[48] And "when a plaintiff attempts to establish a hostile work environment based on the actions of co-workers, he or she must then present evidence that the employer knew or should have known about the harassment and failed to respond in a prompt and effective manner."[49]  In the Eighth Circuit, there is a steep mountain for plaintiffs to climb to prove a hostile work environment claim.[50]  And Ms. Watson has not provided any evidence from which a jury could reasonably conclude that she reached the mountaintop.

Ms. Watson testified at her deposition that, when she first returned to the Newport store as GM, she and Mr. Davis "worked together well."[51]  Then, in May of 2017, "out of nowhere it just

---

[45]   *Id.* at 518-19 (quoting *Singletary*, 423 F.3d at 893).

[46]   *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999).

[47]   *Anderson*, 606 F.3d at 519 (quoting *Al–Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005)).

[48]   *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006) (quoting *Al–Zubaidy*, 406 F.3d at 1039)).

[49]   *Anderson*, 606 F.3d at 519 (internal quotations omitted).

[50]   *See Bozeman v. Ark. Found. for Med. Care*, No. 4:18-CV-00904-LPR, 2020 WL 3512084, at *3 (E.D. Ark. June 29, 2020).

[51]   Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 117:12-16.

started getting bad."[52]  At some point after this change of behavior, Mr. Davis would cross himself off of the work schedule, not show up, and not report his absence to Ms. Watson.[53]  Then, on August 8, 2017, Ms. Watson and Mr. Davis exchanged a series of text messages about needing to restock product at the store.[54]

- Ms. Watson inquired why Mr. Davis went above her in the chain of command and told Shelia Snow about needing product, instead of telling Ms. Watson directly.[55]

- Mr. Davis replied, "First of all [C]rystal[,] Nikki have told all day what the fuck we need so stop being disrespectful before you be in this bitch by yo self."[56]

- Ms. Watson responded, "Number one [I] was asking nicely and respect is [a] 2 way street. It[']s a matter of respect to go thru the chain of command.[]  And all she told me was griddles and lemonade."[57]

- The next message from Mr. Davis read, "I'm not worried about wtf you saying I'm not going to be here much longer so you can fuckn miss me with that."[58]

- The last message from Ms. Watson read, "Ok Jamie."[59]

- The last message from Mr. Davis read, "I'll fucking walk out now bitch."[60]

Ms. Watson states that this was the first time Mr. Davis called her this expletive.[61]  Mr. Davis never used a racial slur toward Ms. Watson.[62]

---

[52] *Id.* at 117:17-19.

[53] *Id.* at 127:11-18.

[54] *Id.* at 124:9-24; Ex. 8 to Defs.' Statement of Facts (Doc. 35-8).

[55] Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 124:9-24.  Ms. Snow was the Operations Manager, who supervised Area Supervisor Rob Hamann, who supervised Ms. Watson.  Ex. 1 to Defs.' Notice of Filing Suppl. Exs. (Doc. 36-1) ¶ 19.

[56] Ex. 8 to Defs.' Statement of Facts (Doc. 35-8) at 2.  Nikki appears to be Mr. Davis's sister-in-law.  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 152:10-16.

[57] Ex. 8 to Defs.' Statement of Facts (Doc. 35-8) at 3.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 130:3-6.

[62] *Id.* at 216:20-22.

Ms. Watson felt disrespected and did not know what to do.  So she called her boss, Area Supervisor Rob Hamann.[63]  She told Mr. Hamann that she felt this was "a very hostile environment" and that she "did not feel comfortable or safe going back to the location."[64]  Mr. Hamann arranged for himself, Ms. Watson, Mr. Davis and Ms. Snow to all meet at Pizza Hut to discuss the situation.[65]  Mr. Davis apologized to Ms. Watson.[66]  Ms. Watson reported feeling like there was less tension after that meeting.[67]

Ms. Watson did not recommend disciplining Mr. Davis for either the work scheduling issues or the text messages discussed above.[68]  She did not discipline him herself.[69]  This is true even though disciplining employees was within Ms. Watson's authority as a GM.[70]  Ms. Watson stated that she was able to discipline "any employee" and that "[t]he whole store was [her] responsibility."[71]  She specifically had authority to discipline Mr. Davis.[72]  And insubordination was a basis for discipline.[73]

Peace after the meeting at Pizza Hut was short-lived.  Later in the month, on August 24, 2017, Mr. Davis texted a work group chat as follows:

---

[63]   *Id.* at 124:25-125:6, 132:24-133:11.

[64]   *Id.* at 134:3-5.

[65]   *Id.* at 125:7-14, 133:4-22.

[66]   *Id.* at 135:3-19.

[67]   *Id.* at 125:7-14, 135:12-19.

[68]   *Id.* at 135:22-25.

[69]   *Id.*

[70]   *Id.* at 95:11-13.

[71]   *Id.* at 95:14-18

[72]   *Id.* at 130:18-20.  In their Statement of Material Facts, Defendants stated that it was undisputed that Ms. Watson had the authority to discipline Mr. Davis.  Pl.'s Statement of Facts (Doc. 43) ¶ 39.  In response, Ms. Watson "[a]greed," but noted that "as [GM], Watson lack[ed] real authority."  *Id.*  For support, Ms. Watson cited to "P118,L12" of Ms. Watson's deposition.  However, that citation provides no support for Ms. Watson's proposition that Ms. Watson lacked "real authority" or otherwise could not have disciplined Mr. Davis.

[73]   Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 97:10-12.

> I will bring my keys in tonight.  I will not be finishing up.  They brought this manger in making GM pay and I've been there for going on five years.  Also screenshot this Rob. I want all my money, holidays too.  If I don't get what's owe[d], I will be talking to human resources.[74]

The next day, August 25, 2017, Mr. Davis quit his job.[75]  Ms. Watson speculates Mr. Davis quit "because he doesn't get vacation pay."[76]

Ms. Watson was out of town on a business trip when Mr. Davis quit.[77]  Sometime after quitting, Mr. Davis came back to the Newport store to ask about his last paycheck.  Ms. Watson spoke to him on that occasion.  She testified about the interaction:

> He said, I need my money.  I said, well, I don't have any control over that.  He said, well, I need my money.  I said, well, you have to contact payroll.  I have nothing to do with that.  I have nothing to do with you needing your money, and then he leaves.[78]

On September 8, 2017, Mr. Davis (who was no longer an employee of Century Management) penned a Facebook post about McDonald's generally and issues regarding his last paycheck specifically.  He wrote:

> So mcdonalds will do anything to keep your money such a shitty company first they say bring back uniforms in order to get your last check after you do that they come up with this bull shit talking bout an exit interview they need to stop playing with people money [I] am not the one already done work my ass off for almost 5 years and they decide to play with my fuckn money [I] should light that bitch up Detroit style mother fucka fucking with wrong one money for real im on one 6am in the morn mcdonalds im on yo head mother fucka ruining n----s days and shit haha hell we shall see who laughing by the end of the day keeping playing watson, snow, and fucking rob bullshit ass company watch the founders you will see

---

[74]  *Id.* at 215:19-24.

[75]  *Id.* at 137:6-12.

[76]  *Id.* at 125:15-19.

[77]  *Id.* at 136:4-9.

[78]  *Id.* at 138:22-139:2.

whats really up here is your fucking exit interview fuckers![79]

Ms. Watson and Mr. Davis were not Facebook friends.[80]  But one of Ms. Watson's friends sent a screenshot of this post to Ms. Watson.[81]  Ms. Watson understood this message as a threat by Mr. Davis to "shoot up the store."[82]  She also testified that, because Mr. Davis mentions her name (along with the name of her boss and her boss's boss) in the Facebook post, she thought "he was coming to shoot [her] personally."[83]  Shortly after seeing the Facebook post, Ms. Watson called Mr. Hamann to tell him about it.[84]  And for the next few days, she worked from other store locations away from Newport.[85] She also filed a police report.[86]

Ms. Watson discussed her safety concerns about returning to the Newport store with Ms. Snow.  Their first discussion was on September 8 or September 11, 2017.[87]  Ms. Watson told Ms. Snow that she did not want to work at the Newport location any longer.[88]  Ms. Snow told Ms. Watson that Ms. Snow would discuss this with HR and get back to Ms. Watson with options.[89]

On September 11 or 12, 2017, Ms. Snow gave Ms. Watson the option of returning to the Newport store as a GM or going to the Walnut Ridge store at a lower title and lower pay.[90]  Ms. Snow told Ms. Watson that, if Ms. Watson took the demotion to department manager, Ms. Watson

---

[79]   Ex. 9 to Defs.' Statement of Facts (Doc. 35-9).

[80]   Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 146:3-6.

[81]   *Id.* at 125:19-24.

[82]   *Id.* at 147:4-11.

[83]   *Id.* at 147:21-148:1.

[84]   *Id.* at 160:5-10.

[85]   *Id.* at 160:13-24.

[86]   *Id.* at 164:8-170:12.

[87]   *Id.* at 161:3-8.

[88]   *Id.* at 161:9-23.

[89]   *Id.* at 161:21-23.

[90]   *Id.* at 169:24-173:10; 180:10-181:18.

could be a GM again when a GM position became available.[91]  Ms. Watson declined to go back to

her GM position at Newport and accepted the Walnut Ridge placement starting on September 18,

2017.[92]  Ms. Watson did not ask if there were other GM vacancies at the time.[93]  She did not inform

Ms. Snow that she would have moved to fill another GM spot.[94]

     Ms. Watson's move to Walnut Ridge created a vacancy for a GM position at the Newport

store.  Ms. Snow hired Mr. Davis back to Century Management for the vacant Newport GM

position.[95]  Ms. Snow says that Mr. Davis was hired back because of "how hard that store was to

staff.  He was [a Hamburger University] graduate.  He was a certified manager."[96]  Ms. Snow

stated that even though Mr. Davis was not ready to be in that role that it "is a harder area and he

was a [Hamburger University] certified manager that McDonald's makes us have in that

position."[97]  A person cannot walk in off the street and be hired as a GM; he or she must "go

through training at corporate levels."[98]  Ms. Snow stated that she would not have hired Mr. Davis

back if Ms. Watson was still working at the Newport store.[99]

---

[91]    Ex. 5 to Defs.' Statement of Facts (Doc. 35-5) at 91:14-17.

[92]    Pl.'s Statement of Facts (Doc. 43) ¶ 51.

[93]    Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 183:13-15.

[94]    *Id.* at 183:16-21.

[95]    Ex. 5 to Defs.' Statement of Facts (Doc. 35-5) at 71:4-7.

[96]    *Id.* at 55:15-19.

[97]    *Id.* at 71:17-19.

[98]    *Id.* at 71:20-21.

[99]    *Id.* at 87:7-19.  At oral argument, Ms. Watson argued that Century Management hired back Mr. Davis prior to Ms. Watson deciding that she didn't want to stay at the Newport store.  Ms. Watson never made this argument in her brief responding to summary judgment.  Indeed, in the "Facts" section of that brief, Ms. Watson quoted Shelia Snow's deposition to say, "Jamie Davis was hired back as general manager in Crystal Watson's position after Watson left the Newport store." Pl.'s Br. in Supp. of Resp. to Mot. for Summ. J. (Doc. 42) at 10.  The depositions of both Ms. Snow and Mr. Hamann are clear about the fact that Mr. Davis was hired as GM in the Newport store only after Ms. Watson made the decision not to return to that location.  Ex. 5 to Defs.' Statement of Facts (Doc. 35-5) at 70:4-6, 87:7-19, 97:11-24; Ex. 6 to Defs.' Statement of Facts (Doc. 35-6) at 25:12-15, 38:17-40:2.  There is, however, a potential discrepancy in the record on this point.  In her deposition, Ms. Watson testified that "the day that Sheila sat me down to tell me I needed to go back to Newport or take a demotion, she told me that Jamie was hired back in my position."  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 170:24-711:2.  Stretching the

Ms. Watson worked at Walnut Ridge for two to three weeks, including taking a week of vacation time.[100]  She then resigned in order to accept another opportunity that became available from Peco Foods.[101]  Her last day with Century Management was on October 4, 2017.[102]

No jury could reasonably conclude that the foregoing proves a hostile work environment claim.  There is no evidence that any of the complained of conduct was gender-based or race-based.  And there is certainly no evidence that the work environment was "permeated with discriminatory intimidation, ridicule, and insult."[103]  It is true that Mr. Davis, a subordinate, once called Ms. Watson a "bitch" in a text message to her.  That's reprehensible.  But this was the first and only time Mr. Davis used that language towards Ms. Watson.  And Mr. Davis never used a racial slur towards Ms. Watson.  Moreover, as soon as Ms. Watson reported this incident to her boss, he took timely action to resolve the problem.  This situation is sad, but it is also the paradigmatic example of a case for which the Eighth Circuit "implores lower courts to apply the demanding harassment standards to filter out complaints attacking the ordinary tribulations of the

---

bounds of reasonable inferences, one could theoretically read this to suggest that Ms. Snow told Ms. Watson that Mr. Davis was being rehired prior to Ms. Watson making her decision to leave the Newport GM position for a demoted position at a different store location.  On the other hand, the more reasonable reading of this testimony is that Ms. Watson made her decision to leave the Newport GM position and was only later told that Mr. Davis was hired for that now-vacant GM position in Newport.  Indeed, Ms. Watson testified that Mr. Davis was brought back to Newport as the GM.  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 171:5-10.  That could not have happened unless Ms. Watson had already refused the Newport GM position and decided that she preferred to go to the Walnut Ridge store.  Accordingly, to the extent that there is a factual dispute as to whether Mr. Davis was rehired or offered a position prior to Ms. Watson's decision or after her decision, that factual dispute is not genuine.  Moreover, given the legal analysis in this Order regarding Ms. Watson's various claims, even if there was a genuine dispute about whether Mr. Davis was rehired or offered a position prior to Ms. Watson's decision, that dispute would not be material.  Whether or not there is a dispute over when Mr. Davis was rehired for the Newport store, there is no dispute that Century Management would have allowed Ms. Watson to maintain her role as the exclusive GM of the Newport location if she wanted to do so.  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 171:11-173:2; Ex. 5 to Defs.' Statement of Facts (Doc. 35-5) at 63:25-64:11.

[100]  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 189:8-192:7.

[101]  *Id.*

[102]  Pl.'s Statement of Facts (Doc. 43) ¶ 54.

[103]  *Singletary*, 423 F.3d at 892 (quoting *Tademe*, 328 F.3d at 991).

14

workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."[104]

The Facebook post, in isolation or in combination with the text messages, does not change the calculus. Even assuming it included a personal threat towards Ms. Watson, there is no evidence that the post or Century Management's reaction to the post constituted *race-based* or *gender-based* harassment. Nothing in the Facebook post is directed at a race or gender.[105] Mr. Davis specifically named three supervisors on his chain of command, two women and one man. Ms. Watson and Mr. Hamann are both white. Ms. Snow's race is unknown from the record. But there is nothing in Mr. Davis's post to suggest that he named those three people because of their race. The common-sense reason Mr. Davis named them is because they are his supervisors and he believed them to be responsible for the delay in receiving his last paycheck after he quit. If there was any indication that this threat was based in race or gender, then the Court might consider whether it is an isolated incident so severe and serious that it would "amount to discriminatory changes in the terms and conditions of employment."[106] But there is no such indication.[107]

As for Century Management's response to the Facebook post, Ms. Watson may think that Century Management reacted inappropriately—by requiring her to take a demotion in order to get

---

[104]  *Al-Zubaidy*, 406 F.3d at 1039 (internal quotations omitted).

[105]  Mr. Davis did threaten to "light that bitch up Detroit style."[105]  It is clear that "bitch" in this context referred to the store and not to a person.

[106]  *Arraleh*, 461 F.3d at 979 (quoting *Al-Zubaidy*, 406 F.3d at 1039).

[107]  The text message and the Facebook post are the primary evidence on which Ms. Watson relies to establish a hostile work environment. However, she also names some incidental actions by Mr. Davis with which she took issue. She described him as "being distant," a slow learner in training, and that he would cross his name off the schedule and not show up to work. Pl.'s Am. Compl. (Doc. 5) ¶¶ 7, 55; Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 120:19-123:11, 127:11-18, 129:11-130:24. None of these issues in isolation or in total satisfy the necessary showing to survive summary judgment.

away from the Newport location[108] and by rehiring Mr. Davis.[109]  Ms. Watson might well be right.

The trouble for Ms. Watson is that the Court is not a human resources officer.  The Court does not

second-guess the personnel decisions of a private company.  The Court does not fix a company's

bad calls unless there is evidence to prove a violation of law occured.  There is nothing to suggest

that Century Management's response was gender-based or race-based harassment.[110]

Century Management is entitled to summary judgment on the hostile work environment

claims under federal and state law.

       3.    *Retaliation Claims*

Ms. Watson alleges that Century Management retaliated against her by way of a

constructive discharge.[111]  Ms. Watson specifies two acts: (1) forcing Ms. Watson to choose

between staying at the Newport location as GM or taking a demotion and $15,000 salary cut to get

away from the Newport location; and (2) hiring back Mr. Davis to the Newport location after Ms.

---

[108]  Ms. Watson was unhappy that Century Management did not make her a co-GM with another existing GM.  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 172:16-173:21.  She observed that when she was a department manager at the Pocahontas store, "there was two co-GMs in Walnut Ridge" sometime between 2008 and 2015. *Id.* at 174:2-175:8.  Ms. Snow explained that there are not typically two GMs in a single location because that is too expensive for the budget.  Ex. 5 to Defs.' Statement of Facts (Doc. 35-5) at 89:11-22.  Ms. Snow also stated that there were two GMs in Walnut Ridge "very briefly" because Century Management had just bought more stores from another owner and promised that nobody would lose their jobs in the transition.  *Id.* at 96:5-97:4.  After that brief transition time, the store returned to having one GM.  *Id.*

[109]  *See supra* note 99.

[110]  At oral argument, Ms. Watson argued that there were other instances of violence against women at Century Management-owned McDonald's stores.  The record shows only one instance of any type of violent behavior: a female employee got into a physical altercation with a female GM of Newport (who preceded both Ms. Watson and Mr. Duffle as GM.)  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 54:10-13, 185:13-186:4; Ex. 5 to Defs.' Statement of Facts (Doc. 35-5) at 65:4-66:24.  There is no evidence that this event involved Ms. Watson in any way other than that she worked at the store during that time.  Ex. 4 to Defs.' Statement of Facts (Doc. 35-4) at 185:24-186:4.  And there is no evidence that this event involved Mr. Davis.  This information is either irrelevant or of such little relevance that it does not meaningfully alter the summary judgment analysis.

At oral argument, Ms. Watson referred to shots being fired at or around a Jonesboro McDonald's store (Red Wolf).  There is no evidence that Ms. Watson was involved in that event.  There is no evidence that Mr. Davis was involved in that event.  The record contains no evidence about what actually happened on that occasion other than speculation. And there is certainly no evidence that connects that occurrence to this case in any way.

[111]  Pl.'s Am. Compl. (Doc. 5) ¶¶ 77-87.

Watson left.[112]

Title VII "prohibits employer retaliation against employees who engage in a protected activity."[113]  When, as here, there is no direct evidence of retaliation, a plaintiff must create an inference of retaliation under a variant of the *McDonnell Douglas* framework.[114]  The framework has three steps: (1) the plaintiff must establish a prima facie case of retaliation; (2) the burden then shifts to the employer to show a legitimate non-retaliatory reason for its conduct; and (3) if the employer produces such evidence, the burden shifts back to the plaintiff to show that the proffered reason was merely pretext for retaliation.[115]  For a plaintiff to make a prima facie case of unlawful retaliation, a plaintiff "must demonstrate that (1) [she] engaged in a statutorily protected activity, (2) the employer took adverse employment action against [her], and (3) a causal connection exists between the employee's protected activity and the employer's adverse employment action."[116]

In the first step of establishing a prima facie case, a plaintiff must show that she engaged in a statutorily protected activity.  Title VII makes it unlawful for an employer to discriminate against any individual because she "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[117]  Protected activity under Title VII takes place when a plaintiff reports unlawful behavior or participates in an

---

[112]   *Id.*

[113]   *AuBuchon*, 743 F.3d at 641.  A review of the Amended Complaint's state law section does not suggest that Ms. Watson is making a state law retaliation claim.  If she were, it would be evaluated using the same standards as are used in Title VII retaliation cases.  *See Burkhart*, 603 F.3d at 476-77 ("Burkhart's retaliation claims are subject to the burden shifting framework of *McDonnell Douglas Corp. v. Green* . . . . We analyze Burkhart's Title VII and ACRA retaliation claims in the same manner.") (internal citation omitted).

[114]   *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 805 (8th Cir. 2019).

[115]   *Id.*

[116]   *AuBuchon*, 743 F.3d at 641.

[117]   42 U.S.C. § 2000e-3(a).

investigation under Title VII.[118]  Examples of protected activity include filing an EEOC charge[119]

or "making a sexual harassment complaint" about a supervisor or co-worker to HR.[120]

Based on the record evidence, a reasonable jury could not conclude that Ms. Watson makes

a prima facie case for retaliation.  Ms. Watson did not engage in statutorily protected activity that

could have been the basis for the alleged adverse employment action.  *First,* while Ms. Watson did

file an EEOC complaint, she did so well after her last day with Century Management.  So, Century

Management could not have retaliated against Ms. Watson for her EEOC complaint.

*Second*, even if Ms. Watson's complaint to her supervisor about Mr. Davis's scheduling

problems and text message constituted statutorily protected activity (a highly debatable

proposition), there is no evidence to suggest that there is a causal connection between this

complaint and the alleged adverse employment action.  After Ms. Watson made this complaint,

she continued working as GM.  There's no suggestion that anyone intended to demote her.  And

there's no suggestion anyone at Century Management intended to take any other adverse

employment action.  If there was adverse employment action ultimately taken, it was only as a

result of the subsequent Facebook post by Mr. Davis and Ms. Watson's reaction to it.  There is a

clear break in any alleged link or causal chain between the complaint and the allegedly adverse

employment action.

*Third*, Ms. Watson's reporting of Mr. Davis's Facebook post to her boss was not statutorily

protected activity.  Mr. Davis was not an employee at the time.  His threat had nothing to do with

gender or race.  Ms. Watson was reporting a potential threat of violence, not sexual harassment or

---

[118] *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002); *Green v. Franklin Nat. Bank of Minneapolis,* 459 F.3d 903, 913-14 (8th Cir. 2006).

[119] *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006).

[120] *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245 (8th Cir.1998).

some other discriminatory conduct.

4.    *Outrageous Conduct*

Ms. Watson's Amended Complaint includes a "count" for "Outrageous Conduct – Punitive Damages."[121]   The best reading of this part of the Amended Complaint is that Ms. Watson is asking for punitive damages based on what she sees as outrageous conduct underlying her various discrimination claims.[122]   However, in Ms. Watson's brief opposing summary judgment, Ms. Watson lists in bullet point-type format Arkansas state cases about the tort of outrage.[123]   To the extent that Ms. Watson pleaded the tort of outrage in the Amended Complaint section on "Outrageous Conduct – Punitive Damages," this claim fails to survive summary judgment. "Arkansas courts have consistently taken a narrow view in recognizing claims for the tort of outrage."[124]   This tort "is not intended to open the doors of the courts to every slight insult or indignity one must endure in life."[125]   Rather, it is reserved for conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[126]   None of the conduct in this case rises to that level.  No reasonable jury could conclude otherwise.

## Conclusion

IT IS THEREFORE ORDERED this 25th day of September that Century Management's Motion for Summary Judgment is GRANTED in its entirety and that judgment is entered for

---

[121]   Pl.'s Am. Compl. (Doc. 5) ¶¶ 88-94.

[122]   *Id.*

[123]   Pl.'s Br. in Supp. of Resp. to Mot. for Summ. J. (Doc. 42) at 28-34.

[124]   *Family Dollar Trucking, Inc. v. Huff*, 2015 Ark. App. 574, at 8, 474 S.W.3d 100, 106-07.

[125]   *Dillard Dep't Stores, Inc. v. Adams*, 315 Ark. 303, 305, 867 S.W.2d 442, 443 (1993) (internal quotations omitted).

[126]   *M. B. M. Co. v. Counce*, 268 Ark. 269, 280, 596 S.W.2d 681, 687 (1980).

Century Management on all claims.[127]

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[127] As the Court stated in footnote 3, the Amended Complaint does not make a free-standing discrimination claim based on the September 2017 demotion. Even if it had, such a claim would not survive summary judgment. First, given that it was Ms. Watson herself who chose to take the demotion rather than remain as the GM of the Newport store, it is not at all clear that the demotion could legally constitute an adverse employment action (or a constructive discharge). Second, there are no similarly situated comparators for Ms. Watson to rely on. For either of those two reasons, Ms. Watson could not make a prima facie case. Third, even if Ms. Watson could show a prima facie case of discrimination, Century Management has provided a legitimate nondiscriminatory reason for the putatively adverse employment action. Specifically, Ms. Watson wanted to leave the Newport store, and the other stores in the area already had GMs. Ms. Watson has provided no evidence from which a reasonable jury could conclude that Century Management's proffered reason is a pretext for intentional discrimination. Ms. Watson did not mention this argument in her brief. And, at oral argument, the best Ms. Watson could do was say that Century Management's decision not to promote Ms. Watson instead of Mr. Duffle, Century Management's decision to promote Mr. Hamann (to a job for which there is no suggestion in the record that Ms. Watson applied for), and Century Management's decision to rehire Mr. Davis somehow constitutes evidence of pretext for intentional discrimination. It does not.